746 F.Supp. 1452 (1990)
In re The DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.
Howard STOUT, Lorena Houlton and Mary E. Hall, Co-Trustees of the Charles S. Page Trust, and Gulf Oil Corporation, Plaintiffs,
v.
UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.
M.D.L. No. 378,
Civ. A. No. 78-1513.
United States District Court, D. Kansas.
September 7, 1990.
*1453 Joseph W. Kennedy of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for Exxon and ARCO.
Emmett Lewis, Washington, D.C., co-counsel for Exxon.
Sam Perkins, Washington, D.C., co-counsel for ARCO.
Ellen Toll, Asst. Atty. Gen., State of Alaska, Anchorage, Alaska, James F. Flug of Lobel, Novins, Lamont & Flug, Washington, D.C., for State of Alaska.

MEMORANDUM AND ORDER
THEIS, District Judge.
This matter is before the court on the Department of Energy's ("DOE") motion for summary judgment against Gulf Oil Corporation ("Gulf") (Doc. 1283), DOE's two amended motions for summary judgment (Doc. 1804, 1825), and the counter motion for partial summary judgment filed by Chevron U.S.A. Inc. ("Chevron") (Doc. 1587). The court heard oral argument on the motions on May 30, 1990. The DOE is seeking judgment against Chevron (successor to Gulf) in the amount of $162,449,034 plus interest accruing after December 31, 1989, through date of payment into the escrow.[1]
From the court's review of the voluminous pleadings, affidavits, and calculations, it appears that the parties have resolved all material disputes regarding the accuracy of the DOE's overcharge calculations. DOE's amended motions for summary judgment (Doc. 1804, 1825) reflect various changes in the calculations based at least in part on Chevron's responsive pleadings. There appear to be no material facts in issue; consequently, summary judgment is appropriate.
DOE's motion for summary judgment identified five factors which resulted in a deficiency in Gulf's deposits into escrow: (1) in calculating its pre-November 1978 overcharges, Gulf deducted a portion of its overcharges reflecting the percentage interests owned by others in various leases; (2) Gulf deducted severance taxes attributable to overcharge amounts for the period prior to November 1978; (3) Gulf used a separate reservoir basis for calculating post-August 1976 overcharges when the properties were certified as stripper on a leasewide basis; (4) Gulf made certain "incorrect" adjustments which Gulf now concedes were improper; and (5) although Gulf's overcharges date from November 1973, Gulf delayed deposits into the escrow account until August 1979.
Chevron's motion for partial summary judgment raises the following issues: (1) that no interest was due before Gulf began making deposits into the escrow pursuant to the court's preliminary injunction; (2) that the United States Rule (payments are applied first to accrued interest then to principal) should not apply; (3) interest, if any is to be awarded, should not exceed the cost to Chevron of borrowing the principal amounts at issue; (4) Chevron is entitled to use the property configurations resulting in the least liability for overcharges; (5) Chevron is entitled to offsets for undercharges which occurred on certain units; and (6) Chevron should not be liable for *1454 severance taxes paid to Texas which have not been refunded and should not be liable for interest on severance taxes paid to Texas and New Mexico.
The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trialwhether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim(s). Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. Anderson, 477 U.S. at 254, 106 S.Ct. at 2513.
For the purposes of the cross motions for summary judgment, the following facts are uncontroverted. The court notes that the DOE's initial calculations have been revised based on matters raised in Chevron's responsive pleadings. The following statement of facts is drawn from the DOE's initial motion for summary judgment, Chevron's response and motion for partial summary judgment, and DOE's response thereto.
1. Gulf certified and sold crude oil produced from the properties identified in Gulf's response to Interrogatory 2 as stripper well oil based on the inclusion of injection wells.
2. Although Gulf's overcharges date from November 1973, it did not deposit any monies into an interest-bearing escrow account until August 1979.
3. In calculating the amount of its initial payment to the escrow account covering overcharges for the period prior to November 1978, Gulf deducted the portion of the overcharges reflecting the percentage interests owned by others. Chevron disputes DOE's characterization of this fact. Chevron asserts that Gulf excluded amounts that had been already paid to other interest owners as those owners' shares of the difference between the stripper well price for crude oil and the controlled price. The court does not believe that this wording dispute is material. By Chevron's own admission, Gulf's initial deposit did not include certain amounts reflecting other interest owners' shares.
4. Gulf deducted severance taxes attributable to overcharge amounts for the period prior to November 1978. Again, Chevron disputes DOE's wording of events. Chevron admits that Gulf, in calculating the amount of its initial payment to the escrow account, excluded amounts that had *1455 been paid to the states of New Mexico and Texas as severance taxes on the stripper well price increment.
5. For the purpose of its payment to the escrow, Gulf calculated the post-August 1976 overcharges on crude oil produced from four properties  Hutchings Stock Association Tract K, Keystone Cattle Company Tract F, McElroy Consolidated No. 1, and E.W. Estes Tract B  on a separate reservoir basis when Gulf continued to certify those properties as stripper on a leasewide basis.
6. DOE initially claimed that Gulf calculated the post-1976 overcharges on Keystone Cattle Company Tract A on a separate reservoir basis when the property was certified as stripper on a leasewide basis. Although DOE does not specifically address the issue, it appears that DOE has withdrawn this claim. See Doc. 1806 (Supplemental Declaration of John Wesner) ¶ 12 (accepting the errors identified by Chevron in the overcharge calculations for this tract).
7. Gulf made certain "adjustments" in December 1981 which were intended to reverse some prior payments. The adjustments consisted of a payment to the escrow account of $13,471,087 and instructions to the escrow holder to allocate the deposit among certain properties, and to reallocate some prior deposits among certain properties.
8. Using the interest rate set forth in DOE's Policy Statement on Interest, 46 Fed.Reg. 21,412 (April 10, 1981) and using the United States Rule that deposits are applied first to interest, the remaining deficiencies with interest as of December 31, 1989, total $162,449,034.
9. Gulf paid $87,956,798.60 to the escrow account in August 1979.
10. Gulf gave written notice of the court's injunction to other interest owners who had received a portion of the overcharges. Gulf suggested that they consider paying to the escrow account the amounts that they had received which were covered by the disputed stripper oil certifications in the period prior to November 1978. Several interest holders provided funds totalling $932,210.62, which Gulf paid into the escrow in March 1980.
11. On June 5, 1986, Chevron paid to the escrow account $83,150.85 which the State of New Mexico had paid to Chevron as a refund, without interest, of severance taxes paid by Gulf on amounts claimed by DOE to be overcharges.
12. On September 8, 1986, Chevron paid to the escrow fund $13,945,936.
13. At all times between November 1973 and January 1981, Keystone Cattle Company Tracts A, B, and F were within the Keystone NCT Tract, all of which was subject to a single right to product arising from a single lease. The single right to produce and lease covered both the Keystone NCT and Flying W NCT tracts. In 1979, the DOE's Office of Special Counsel asserted that each of the two tracts could be treated as a separate "property," or the two could be treated as a single "property." [DOE asserts that these facts are not material.]
14. If the court adopts Chevron's position that Gulf's overcharges for the period November 1973 through January 1981 for the crude oil produced on Keystone Cattle Company Tracts A, B, and F should be computed on the basis that the oil was from a single "property," Gulf's overcharges would be reduced. The parties do not agree on the amount, but believe they could resolve this matter should the court accept Chevron's contentions as a matter of law.
15. The separate reservoirs underlying the E.W. Estes Tract B, Hutchings Stock Association Tract K, McElroy Consolidated No. 1, G.W. O'Brien, et al., and Keystone Cattle Company Tract F tracts are separate and distinct from, and not in communication with, any other producing formation; have been recognized as separate by the appropriate governmental regulatory authority; Gulf separately reported to local government the production from these reservoirs. [DOE asserts that these facts are not material.]
16. Computation of Gulf's overcharges on a separate reservoir basis for the period September 1976 through November 1978 *1456 with respect to crude oil produced on the E.W. Estes Tract B, Hutchings Stock Association Tract K, and McElroy Consolidated No. 1 would reduce Gulf's overcharges as claimed by DOE by approximately $1.4 million. [DOE asserts that this fact is not material; however, it does not dispute the amount asserted by Chevron.]
17. Computation of Gulf's overcharges on a separate reservoir basis for the period September 1976 through November 1978 with respect to crude oil produced under the G.W. O'Brien lease could reduce Gulf's overcharges as claimed by DOE by approximately $2 million. [DOE again asserts that this fact is not material; however, it does not dispute the amount as set forth in the Supplemental Declaration of Glenn H. Deiss, Doc. 1768.]
18. Clerical errors, including duplicate payments to the injection well litigation escrow account by Gulf, reduce DOE's claims of overcharges by $226,837. DOE does not dispute the amount as set forth in the Supplemental Declaration of Glenn H. Deiss and notes that it has recognized the total amount of these errors, and has revised its overcharge figures accordingly.
19. Pricing errors by DOE with respect to sales of oil from the Keystone Tract A and the E.W. Estes Tract B reduce Gulf's overcharges as claimed by DOE by $200,554.05 and $12,413.21, respectively. DOE also agrees that it made pricing errors concerning Hutchings Stock Association Tract K, requiring further revision of the overcharge amounts sought.
20. The Littlefield "AB" federal property was a federal lease administered by the United States Department of the Interior under which the United States reserved a one-eighth (12.5%) royalty.
21. Of the $1,543,043 claimed by DOE as an alleged deficiency with respect to the Littlefield "AB" federal property from January 1974 through October 1978, one-eighth, or $191,755 was paid to the United States throughout that period as a result of its royalty interest.
22. In December 1981, Gulf paid $609,495.43 into the stripper well litigation escrow account covering potential overcharges for oil sold from the Littlefield "AB" federal property from November 1, 1978 through November 1979; included in that deposit was $76,186.92 representing the United States' one-eighth share of the potential overcharge.
23. Commencing December 1, 1978, the United States began taking its one-eighth royalty share of production from the Littlefield "AB" federal property in kind and selling the crude oil itself for its own account.
24. Although Gulf has demanded that the United States reimburse Gulf for the $76,186.92 paid into the escrow account for the royalty interest of the United States for the period November 1, 1978 through November 30, 1979, the United States has refused such payment.
25. In response to Chevron's argument that it should not be required to make restitution for the amount of overcharges paid to the federal government as a royalty interest owner, the DOE has reduced the amount it seeks accordingly. See Doc. 1805, p. 32.
26. During the period May 1974 through December 1977, Gulf charged less than the ceiling price for crude oil produced from the Keystone Holt Unit. DOE asserts that this fact is not material. The specific amount of the undercharge is in dispute.
27. No purchaser paid, and Gulf never received, the $109,148.63 DOE seeks as an overcharge on the Murray "C" Lease. The DOE has reduced its claim accordingly. See Doc. 1805, p. 32.
28. Gulf paid the State of Texas severance taxes on the gross value of crude oil Gulf produced in Texas through October 1978, including the incremental value based on Gulf's stripper certifications. [DOE asserts this fact is not material.]
29. The State of Texas, as a party to the Final Settlement Agreement, will receive a portion of any funds Chevron is ordered to pay to the escrow account. [DOE asserts that this fact is not material.]
30. Texas refuses to pay any refund to Chevron for the severance taxes at issue in this case until Chevron pays into escrow an *1457 amount specifically designated as being for Texas severance taxes. [DOE asserts that this fact is not material.]
31. Using the interest rates that Chevron paid for new debt for the time period covered by DOE's deficiency calculations, instead of using the DOE's policy rates, would result in a deficiency approximately $34.2 million less than the amount sought by DOE. [DOE asserts that this fact is not material.]
32. During the period for which DOE seeks interest, Chevron and Gulf obtained funds in amounts comparable to the amounts sought by DOE in this action by borrowing at costs which were, on average over the period, below the rates sought by DOE in this action. [DOE asserts that this fact is not material.]
33. The average effective annual rate of interest earned from August 1979 through August 1986 by funds deposited by Gulf and Chevron into the escrow account was 10.72%. [DOE asserts that this fact is not material.]
34. Chevron has set forth the yearly average 90-day United States Treasury Bill rates for 1973 through 1988 in its pleadings. See Declaration of Gary L. Wright, Doc. 1591, Exh. 10. The court will not list those rates here. [DOE asserts that these interest rates are not material.]

Operator Liability
DOE argues that Gulf, as operator of the crude oil producing properties at issue here, is liable for restitution of all the overcharges which occurred. Chevron's counter motion for partial summary judgment did not address the operator liability doctrine. Under the operator liability doctrine, the operator of a property, here, Gulf/Chevron, may be held liable for the entire amount of the overcharges which occurred, even though other interest owners have received a portion of the overcharges. Case law from the Temporary Emergency Court of Appeals supports the application of this theory of liability. See United States v. Exxon Corp., 773 F.2d 1240 (Temp.Emer.Ct.App.1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); Sauder v. Department of Energy, 648 F.2d 1341 (Temp.Emer.Ct. App.1981).
This court has previously ruled that the operator liability doctrine shall apply. See 722 F.Supp. 649 (D.Kan.1989) (granting DOE's motion for summary judgment against Mobil); 739 F.Supp. 1446 (D.Kan. 1990) (holding that the operator liability doctrine was applicable and denying Mobil's motion for reconsideration on the operator liability issue). The court sees no reason to depart from its previous holding. Consequently, Chevron shall be held liable as operator for the entire amount of the overcharges which occurred, except for that portion attributable to the United States as royalty interest owner. See supra Fact ¶ 25.

Taxes
The court also addressed the issue of severance taxes in the Mobil summary judgment proceeding. Chevron raises no new issues here. Chevron argues that it did not receive the amounts it paid as severance taxes, and could not therefore pay those amounts into the court's escrow; that the State of Texas will receive a double recovery, having retained the severance taxes and being a recipient of future distributions from the escrow; that Texas should be forced to pay the taxes back; and that interest should not be assessed on the severance tax amounts. The court has previously rejected these arguments regarding taxes paid to the State of Oklahoma in the Mobil decisions. 722 F.Supp. at 657, 658-59; 739 F.Supp. at 1448-49. The court sees neither any reason to depart from its previous rulings nor the need to discuss the issue further.
Chevron requests that the court set aside Texas' distributions from the escrow. The court has set aside further distributions to the State of Oklahoma pending resolution of the Mobil case. Doc. 1692. The court will withhold future escrow distributions from the State of Texas as well.

Interest and the United States Rule
The court addressed the issues of the appropriate rate of interest and the application of the United States Rule in the Mobil summary judgment proceeding. The *1458 court ordered that DOE's policy rates of interest shall be applied. Further, the court ordered that the United States Rule  that payments are first credited to accrued interest  shall be applied. 722 F.Supp. at 659-61; 739 F.Supp. at 1448-49.
Chevron argues that the DOE policy rates do not achieve restitution, since they do not reflect actual borrowing costs, have no relation to the value of the funds retained by Chevron, and do not approximate the rate of interest earned by the funds in the escrow. Restitution is a remedy by which the defendant is made to disgorge illgotten gains, or the restore the status quo, or to accomplish both objectives. Kern Oil & Refining Co. v. Tenneco Oil Co., 868 F.2d 1279, 1282 (Temp.Emer.Ct. App.1989); United States v. Exxon Corp., 773 F.2d 1240, 1278 (Temp.Emer.Ct.App. 1985), cert. denied, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986); Sauder v. Department of Energy, 648 F.2d 1341, 1348 (Temp.Emer.Ct.App.1981). Chevron argued at the hearing that the restitutionary purpose of an award of prejudgment interest is to accomplish either the disgorgement of benefits, i.e., the interest should approximate the value to Gulf of borrowing the money, or should restore the status quo, i.e., restore the loss to the escrow.
Accepting Chevron's arguments on the appropriate rate of interest, however, would result in the application of inconsistent interest rates in the remaining overcharge cases and would not lead to uniformity in decisions. The court has considered Chevron's arguments, but sees no compelling reason to depart from the prior rulings on interest rates.
Chevron argues that no precedent exists for applying the United States Rule  that payments are first credited to accrued interest, then to principal  to a deposit into court as security for a preliminary injunction. Chevron asserts that there was no debt due and no interest due when Gulf made its deposits into escrow. The court disagrees. Interest was considered by the original parties to this action. Plaintiffs' counsel in the lead case, Energy Reserves Group, Inc. v. Federal Energy Administration, was aware that if the subject properties were improperly certified as stripper properties, the plaintiffs would be subject to a refund of the overcharges with interest, plus civil and criminal penalties. See Energy Reserves Group, Inc. v. Federal Energy Administration, No. 77-1146, Doc. 18 (Tr. of May 26, 1977 preliminary injunction hearing) at 84. At the hearing on the initial motion for preliminary injunction filed by the Energy Reserves plaintiffs, the court stated that if Ruling 1974-29 was upheld, the firms would owe "every dime" of the overcharges, plus interest. Id., Doc. 18, at 118, 121-22.
Chevron also argues that the United States Rule achieves the same result as compounding of interest prior to October 1, 1979, when it was against DOE policy to compound interest. Absent the United States Rule, Gulf's payments would have been applied first to principal. Applying the United States Rule, Gulf's payments were applied first to the accrued simple interest (i.e., interest which was not compounding) rather than to principal amounts which continued to accrue simple interest. The fact that the application of the United States Rule results in Chevron's liability for larger sums on which interest was accruing (principal) while reducing sums on which interest did not accrue (simple interest) does not convert simple interest to compound interest.
The United States Rule shall apply unless there is a statute or agreement to the contrary. See 722 F.Supp. at 661 (order granting DOE's motion for summary judgment against Mobil). The court will not depart from its prior ruling on the issue of the appropriate rate of interest and the application of the United States Rule.

Property Configurations
Under DOE price regulations, determination of whether oil was stripper well oil was based on the volume of production from a "property." Prior to 1976, under DOE's regulations, "property" was defined as the right to produce domestic crude oil, arising from a lease or from a fee interest. 10 C.F.R. 212.72. Effective September 1, 1976, firms could treat as a separate property each separate and distinct producing reservoir contained within a lease, provided *1459 that the reservoir was recognized by the appropriate governmental regulatory agency as a producing formation that was separate and distinct from and not in communication with any other producing formation. 41 Fed.Reg. 36,172, 36,184 (Aug. 26, 1976). Thus, a given premises may have been subject to more than one property configuration for purposes of determining the maximum lawful price for crude oil sold from that premises.
DOE argues that Gulf did not use the same property designation to calculate its overcharges as it did to make its stripper well certifications. Gulf designated each of the following four leases as a property and made its stripper well certifications on that basis: Hutchings Stock Association Tract K, Keystone Cattle Company Tract F, McElroy Consolidated No. 1, and E.W. Estes Tract B. Gulf never changed those property designations during the period of price controls. In calculating its deposits to the escrow for its overcharges for these properties, Gulf calculated its deposits as if each of the reservoirs located within each of the leases was a separate property.
Chevron argues that in determining the amount of overcharges due, it is not bound by the property configurations used when Gulf certified and sold the crude oil in question. Chevron contends that it is entitled to have Gulf's overcharges calculated on the basis of the property configurations that are most favorable to it, i.e., the configurations that produce the lowest overcharge. Chevron admits that in calculating the potential overcharges for crude oil produced from the four tracts identified above for purposes of making payments into the escrow account, Gulf treated some of the oil produced as coming from "reservoir" properties rather than from properties consisting of individual leases. Gulf's underlying stripper well certifications were not made on a reservoir basis, but on a leasewide basis.
Chevron identifies four tracts  Hutchings Stock Association Tract K, McElroy Consolidated No. 1, E.W. Estes Tract B, and G.W. O'Brien, et al.  which were treated as "lease" properties in determining overcharges, for which Gulf had the option after September 1, 1976 of treating each separate reservoir underlying each tract as a separate "reservoir" property. Gulf did not exercise this option during the relevant time. Chevron also seeks an alternate property configuration for Keystone Cattle Company Tracts A, B, and F. Chevron argues that, although treated as "lease" properties by DOE in calculating Gulf's alleged overcharges, Keystone Cattle Company Tracts A, B, and F were subject to aggregation into the larger Keystone NCT Property. If the court rejects Chevron's contention that these leases should be aggregated, Chevron would seek separate "reservoir" treatment.
DOE responds that unless the company has used an impermissible property configuration to initially set its prices, it is not entitled to have its overcharges computed on the basis of the alternative configuration which results in the lowest amount of overcharges. In other words, if a producer's property configuration was impermissible and resulted in liability for overcharges, in determining the amount of overcharges the producer is entitled to use the lawful property designation most favorable to it if several property configurations are available. In the present case, Gulf's property configurations  on a lease basis  were lawful at the time.
In the present case, Gulf used an impermissible method of certifying certain crude oil as exempt from price controls  i.e., counting injection wells in the well count on the property to determine whether the stripper well exemption was met. However, Gulf did not use impermissible property configurations. Chevron argues that the property configurations are related to the certification of oil as stripper. If Gulf had made use of different property configurations, certain properties would have qualified for the stripper well exemption without the inclusion of injection wells.
The court agrees with DOE that Chevron should be bound by the property configurations Gulf employed in its original stripper well certifications. Gulf's original property designations, which it never changed, were proper and lawful. Chevron should not be allowed to change its property configurations *1460 after the fact now that it appears that the choice Gulf made was an unfavorable one.
DOE further argues that a prior settlement between Chevron and DOE bars contesting the property designations in this case. Chevron counters that the consent order did not affect the issues or claims pending in this action and that property configurations are an issue in this action. The consent order provides in pertinent part:
All pending and potential civil and administrative claims, whether or not known, demands, liabilities, causes of action or other proceedings by DOE against Gulf regarding Gulf's compliance with and obligations under the federal petroleum price and allocation regulations during the period covered by this Consent Order, whether or not heretofore raised by an issue letter, Notice of Probable Violation, Notice of Proposed Disallowance, Proposed Remedial Order, Proposed Order of Disallowance, Remedial Order, action in court or otherwise are resolved and extinguished as to Gulf by this Consent Order, except that this Consent Order does not cover or affect:
(a) the issues or claims now pending, and those related thereto, in Howard Stout and Gulf Oil Corporation v. Department of Energy, et al., No. 78-1513 (D.Kan), consolidated in In Re The Department of Energy Stripper Well Exemption Litigation, MDL No. 378 (D.Kan.) (The issues and claims excluded from the Consent Order by this paragraph also include those matters covered by the "Stipulation Staying Certain Portions of the Proposed Remedial Order," dated October 25, 1983, before OHA in Case No. DRO-0194);
....
Doc. 1805, Exh. C, ¶ 501(a) (consent order published at 50 Fed.Reg. 9497 (March 8, 1985)). The court finds it necessary to quote at length from the Stipulation Staying Certain Portions of the Proposed Remedial Order (See Doc. 1805, Exh. D) referred to in the consent order. That stipulation provides in relevant part:
On May 1, 1979, the Office of Special Counsel ("OSC") issued a Proposed Remedial Order ("PRO") to Gulf Oil Corporation and Gulf Oil Exploration and Production Company ("Gulf"). Inter alia the PRO alleges the Gulf improperly treated injection wells as producing wells when computing the average daily production ("ADP") per well for purposes of determining whether certain premises qualified for the stripper well exemption. (This issue will hereinafter be referred to as "the injection well issue.") The PRO further alleges that, as a result of having counted injection wells, Gulf improperly designated certain premises as stripper well properties and overcharged customers on first sales of domestic crude oil.
The injection well issue is also the subject of multidistrict litigation in the United States District Court for the District of Kansas, In re DOE Stripper Well Exemption Litigation, M.D.L. Docket No. 378 ("the multidistrict litigation"). Gulf is a party to that litigation and the premises and time periods that are the subject of the injection well allegations of the PRO are also under consideration in the multidistrict litigation.
....
Thus, presently pending before the district court is the determination of the amount of the producers' full liability, including Gulf's, for violations arising from the injection well issue.
Recently, OHA [Office of Hearings and Appeals] asked the parties to consider whether briefing of the injection well issue, which had been stayed by OHA's September 1, 1981, order, should remain stayed or whether briefing with respect to this aspect of the PRO should continue.
Upon consideration of this matter, Gulf and the OSC have agreed and submit that it would be in the interest of administrative efficiency and prompt resolution of the injection well issue to avoid duplicative litigation of the issue in both the PRO proceeding and the multidistrict litigation. Gulf and OSC believe that the amount of Gulf's full liability with respect to the injection well issue is capable of prompt determination in the multidistrict litigation. In order to expedite resolution *1461 of the issue, Gulf and OSC recommend to OHA that it approve this stipulation.
Nevertheless, certain issues in the administrative proceeding, as described below, are not under consideration in the multidistrict litigation and the parties agree that such issue should not be stayed at OHA but should proceed apace. Nothing in this stipulation is intended to limit OHA's determination of any matters other than the injection well issue and Gulf's liability thereunder, or to relieve Gulf from possible liability for matters alleged in the PRO proceeding that are not at issue and determined in the multidistrict litigation. Nor is it intended that this stipulation be construed as a bar or waiver to any objection which either party may interpose, or any argument that either party may raise, in the multidistrict litigation....
....
2. Certain issues raised in the administrative adjudication of the injection well issue are not subject to this stay. One such issue concerns the appropriateness of Gulf's segregation of certain injection well leases into multiple MPPR properties. [fn. 1] Nothing in this stipulation is intended to stay or delay OHA's consideration and resolution of the appropriate property configuration and other non-injection well issues with respect to leases that also are the subject of injection well allegations....
[fn. 1 provides: In the PRO, OSC has alleged that Gulf's multiple property treatment of these leases was improper. Gulf has defended its property designations and has also alleged that other multiple property configurations of these leases would have been permissible. With respect to these leases the total overcharge alleged in the PRO is based upon both injection well allegations and non-injection well allegations. However, the multidistrict litigation concerns only the inclusion of injection wells in the calculation of ADP for Gulf-designated "properties"; Gulf's segregation of a premises is not addressed.]
3. ... As noted above, a dispute exists between the agency and Gulf concerning the validity of Gulf's property configurations. The parties acknowledge that, with respect to premises in which both injection well and property configuration allegations are at issue, Gulf's ultimate liability, if any, cannot be determined until both issues have been finally resolved by the appropriate tribunals.
Doc. 1805, Exh. D, at pp. 1-2, 4-5, 6-7 (emphasis added). As indicated in the stipulation, consideration of the injection well issue was stayed by OHA; consideration of property configuration issues was not stayed. Only those matters previously stayed by the stipulation were excluded from the consent order; consequently, the court concludes that the property configuration issue was settled by the consent order. The consent order would be meaningless if Chevron could resurrect all issues involved in the prior administrative proceedings. The court agrees with the statements of DOE counsel at the hearing, that the consent order bars both parties to this action from challenging the property configurations used by Gulf.

Undercharges
Chevron asserts that certain undercharges occurred on a property known as the Keystone Holt Unit. Gulf charged less than the ceiling price for crude oil from the Keystone Holt Unit. Chevron asserts that since the undercharges occurred on either the same property or during the same time period on another property, it is entitled to offset the overcharges which occurred on the stripper well property. The undercharges and overcharges occurred during the same DOE audit period. Further, Chevron argues that the undercharges and the overcharges grew out of a single set of price control regulations.
DOE asserts, and Chevron does not deny, that the undercharges are from a property which is not involved in this proceeding. This property is not included among the properties in the DOE auditor's calculations of stripper well overcharges at issue here. See Doc. 1806, Exh. 1-60, 62. *1462 DOE argues that the undercharges are not sufficiently related to the overcharges to justify the offset. The undercharges were not related to the certification of properties as stripper well properties based on the inclusion of injection wells. The undercharges do not involve the stripper well exemption from price controls. If the court allowed Chevron to use these undercharges as offsets, the court would be inviting every operator to go through its records looking for any instance when it may have sold crude oil below the controlled price  no matter how unrelated to the stripper well exemption at issue in the present action. The court would also be inviting DOE to search for unrelated overcharges caused by the remaining operators. This activity would needlessly prolong this protracted litigation.
DOE audited Gulf's crude oil sales from the Keystone Holt Unit and found that Gulf charged less than the ceiling price during the period May 1974 through December 1977. The administrative proceedings in which DOE audited Gulf's sales from the Keystone Holt Unit were terminated by a consent order. See Doc. 1805, Exh. C (consent order published at 50 Fed. Reg. 9497 (March 8, 1985)). Chevron asserts that the consent order is not a bar, since the order specifically excluded the issues pending in this multidistrict litigation. DOE argues that the consent order is a bar, since it settled all matters between DOE and Chevron except those specifically excluded.
The court will disallow the use of these undercharges as an offset against overcharges for two reasons. First, the undercharges did not result from an incorrect application of the stripper well exemption. Only the injection well issue regarding the stripper well exemption is involved in this action. Second, the consent order between DOE and Chevron settled this matter. The parties stipulated that this multidistrict litigation concerned only the inclusion of injection wells in the calculation of average daily production for Gulf-designated properties. Doc. 1805, Exh. D, at p. 6 n. 1. Undercharges on other (non-stripper well) oil was not an issue in the present litigation and was therefore not excluded from the coverage of the consent order.
IT IS BY THE COURT THEREFORE ORDERED that the Department of Energy's motion for summary judgment (Doc. 1283) as modified by its two amended motions for summary judgment (Doc. 1804, 1825) are hereby granted.
IT IS FURTHER ORDERED that Chevron's motion for partial summary judgment (Doc. 1587) is hereby denied.
The Clerk shall enter judgment in favor of the DOE and against Chevron, ordering Chevron to deposit the amount of $162,449,034, plus interest accruing after December 31, 1989 through the date of payment into the escrow account established by the court.
IT IS FURTHER ORDERED that, until further order of the court, Bank IV shall withhold from distribution to the State of Texas all M.D.L. 378 funds to which the State of Texas would ordinarily be entitled. Bank IV shall maintain those withheld funds invested.
The clerk shall mail a copy of this order to counsel of record and the appropriate official at Bank IV.
NOTES
[1] In this opinion, the court shall refer to both Gulf and Chevron. The court shall refer to Gulf when discussing the actions Gulf took which gave rise to the DOE's claim. The court shall refer to Chevron when discussing the arguments and litigation positions presently being taken.